## McElvain v. State.

### Opinion delivered October 23, 1911.

1. Jurors—competency.—Jurors were not disqualified in a murder case who had heard the case talked of or had read of it in the newspapers but had not talked to the witnesses nor formed any such opinion as would prevent them from giving the accused a fair and impartial trial. (Page 450.)

2. Appeal and error—necessity of objection to evidence in capital case.—Where testimony was introduced without objection in a capital case, its admission will not be reviewed on appeal. (Page 450.)

Appeal from Mississippi Circuit Court, Osceola District; *Frank Smith,* Judge; affirmed.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

1.   There is no prejudicial error in any of the instructions of the court.   Moreover, no objection was raised to any of them in the lower court, and they are not before this court for review.   94 Ark. 65.

2.   The testimony shows that none of the jurors challenged for cause were disqualified.   A venireman who states that from rumors or newspaper reports he has formed an opinion, but that for the purposes of the trial he could disregard such opinion and give the defendant a fair and impartial trial, is competent.   66 Ark. 53;   72 Ark. 313;   79 Ark. 127;   85 Ark. 64;   80 Ark. 13;   85 Ark. 536;   47 Ark. 180.

Before a defendant can avail himself of the objection to the court's ruling that a juror was competent, he must show that his peremptory challenges were exhausted.   30 Ark. 328;   50 Ark. 494;   69 Ark. 332;   *Id.* 449;   93 Ark. 168.

3.   The court properly admitted the testimony of the child, Caroline Thomasson.   An examination of her testimony shows that she was competent.   25 Ark. 448;   *Id.* 92;   93 Ark. 158.

Kirby, J.   The appellant, John McElvain, was indicted and convicted of the murder of Jake Thomasson, and sentenced to be hanged.

Thomasson's family consisted of himself and wife and six children, the oldest ten years of age, and McElvain worked for or with Thomasson, and lived with the family, all sleeping in the same room.

On the day of the killing, McElvain had been out hunting, and returned late in the evening, and was seen by Mrs. Thomasson, sitting in the barn door shucking corn and throwing it to the hogs.   Thomasson went to the woodyard, and was cutting stove wood, and his wife was busy cooking supper, when she heard the report of a gun, and some one said "Oh, Lord!"   Mrs. Thomasson ran to the door, and saw her husband lying flat on his face, the appellant walking towards him and throwing a shell out of his gun or throwing another one in.   Thomasson

said: "Don't do that!" and he walked up within six or seven feet of him and fired again, shot him in the side of his head and face. McElvain was about twenty-five feet from her husband walking towards him when she first saw him, and Thomasson was lying on the ground on his face. He said nothing to any one, did not seem to be excited at all, and, after firing the second shot, turned and walked towards the barn.

Appellant testified that he had been living with the family for about a month before the killing occurred, and on that day he had returned from hunting between sundown and dark, and "Mr. Thomasson was out getting some stove wood, and I came up below the lot, and I gave Mr. Thomasson's hogs and geese some corn; I generally done most of the feeding, and when I come up they were following after me, and I went by the crib, and threw them out a few ears of corn. I crawled through the wire fence, it wasn't stretched tight, and I went through there to get around the lot to keep from having to go through the mud, and I went up the fence and got pretty close to Mr. Thomasson, and he says: 'Well, I have moved that bed of yours up stairs.' And I says, 'You will have the trouble of moving it down; I am not going to sleep up there until after the bad weather is over.' And he drew the ax back left-handed, and said, 'You son-of-a-bitch, you will sleep there, or I will chop your head off.' And I commenced backing from him, and I asked him to stop three times, and I told him if he didn't stop I would stop him. He kept coming, and I was backing back just about as fast as he was coming to me, and I threw the gun down on him, and he turned his left side to me. He had the ax drawn back right-handed, and he turned his left side to me like he was going to throw the ax at me, and I shot him, and he was still making motions, walking towards me as he turned his left side, and I shot him, and as quick as I could pump the gun I shot again; I shot the second time in rapid succession. If a shell hung, I did not know anything about it. He started on me with an ax, and I began backing, and he kept coming, and I told him to stop, or I would stop him. He spoke about going to put my bed up stairs, and make me sleep there, and I told him I would not do it. That was Friday or Saturday before that. The house was a story and a half high, and there was no window in the attic at all, and no ceiling and only a rough gum

floor. There were big cracks in it, and no provision made for fire or anything. I told him I didn't mind sleeping up there in good weather if he would cut a window up there, but that it would be too bad in cold weather. I didn't argue with him a bit. He just started coming at me with the ax. He was chopping wood when I first spoke to him."

On cross-examination, he said: "Thomasson and I were good friends. There had never been any trouble between us. He liked me, and I liked him. Up to the time of the killing, there never had been any trouble between us. We all slept in the same room, himself and his wife and the babies. All the family treated me well, both Thomasson and his wife and the children, and there was no friction whatever between us. I told him three times to stop. I didn't shoot him in the back."

The clothes that deceased was wearing when shot were exhibited to defendant, and he was asked:

"Q. Did you see where the shot hit him; there in the middle of the back seam of the overalls?

"A. It looks to be.

"Q. You know it is, don't you?

"A. It looks like it.

"Q. You know it. Here is the sleeve of one arm, and here is the other, and there is the seam that runs down the back, the center seam. Do you see that? You shot him on both sides of the center seam in the middle of the back. Didn't you? Don't you see?

"A. There are shot holes in there, but I can't swear they are the same clothes.

"Q. There are shot holes all over the back and side?

"A. There are shot holes along there.

"Q. The main load of your shot struck him between the seam that runs down under the left arm and the seam in the middle of the back?

"A. It looks like it.

"Q. There is one hole there, just one shot under the seam; do you see it?

"A. Yes, sir; there is a hole there.

"Q. There are four over there?

"A. Yes, sir; there are four over there; but I don't know whether they are the clothes or not."

A loaded and an empty shell were found the next day near the place where appellant was standing when he fired the first shot, and Thomasson's face was powder burned, "black as my hat," as one witness said, "and a hole in his face that I could run my fist through."

A witness testified that appellant told him that he was about 35 feet from the deceased when he shot him the first time. That the empty shell lodged in his gun, and he had to get that out and throw another one in. That he walked towards him, and gave him the second shot, and finished him up.

Appellant denied having made this statement and also any conversation with the witness relative to having admitted an undue intimacy with the wife of deceased.

Cameline Thomasson, the eight-year old girl of deceased, after being examined by the court as to her intelligence and ability to understand the obligation of an oath, testified as follows:

"I am eight years old. I have never been in court before. I know what it means to take an oath. It means to tell the truth, and you will be punished if you don't. It means not to tell a lie. It means to tell the truth, or you will be punished. People who tell lies will go to the bad man. No one taught me this. I have known it all the time. I was on the porch when my father was shot. He was chopping stove wood. Mr. McElvain was in the yard, standing near the corner of the porch. He had his back towards the house. He did not say anything to papa before he shot him, and papa did not say anything to him. Papa was chopping wood when he shot him the first time, and the second time he was lying on the ground. He was standing out in the road when he shot him the second time. He went up close to him and shot him. Before he shot him the last time, papa said: "Don't do that." After he shot him the second time, he went out into the lot, and then he came back and raised papa up to see if he was dead. My sister and I went out there afterwards. She is at home sick with the measles. We turned our father over, and he was dead."

The little girl's mother testified that she was eight years old in February before. That she did not know whether the child saw the shooting or not. That she had talked to her

about what she had seen several times, and that the girl always related it each time about as she had told it on the witness stand.

McElvain, recalled, stated: "As I was leaving the barn, the oldest little girl was going into the house. She was just leaving her father, and had a load of stove wood in her arms; and if there were any children on the porch, I did not see them. I did not see the little girl who has testified she was on the porch. If she had been there, I could have seen her. I did not look particularly to see whether any body was there or not."

Appellant was defended by counsel appointed by the court at the trial, and no brief has been filed here on his behalf, but there are seven assignments of error in the motion for new trial; the first three alleging that the verdict was contrary to the law and against the evidence.

From the testimony already recited, it easily appears that there had been no unfriendly feeling whatever upon the part of deceased towards or against the appellant; that they had had no quarrel, and that the killing, if it occurred, as testified to by the State's witnesses, was altogether unprovoked and done in cold blood, the deceased having been shot in the back without warning the first time and having been shot a second time while lying upon the ground beseeching the defendant not to do it.

There was so little probability of the truth of his statement of being attacked by the deceased with an ax, under the circumstances as he related them, that the jury did not believe him, and there was some testimony tending to show admitted intimacy on his part with the wife of deceased, which, although unknown to deceased, may have furnished sufficient motive for defendant to have committed the deed, removing the husband in expectation of possessing the wife entirely. It also appears that she left the scene of the killing immediately for a neighbor's house leaving the little children alone with their dead father for an hour or more, and had been arrested in connection with the killing. The defendant voluntarily surrendered to the officers after the killing, but afterwards escaped from jail before his trial, and went to Kentucky, whence he was brought back by requisition.

The testimony is amply sufficient to warrant the conviction. No objections were made to any of the instructions

given by the court, and we have examined the charge carefully, and do not find that any error was committed by the court in declaring the law to the jury.

By the fourth, fifth and sixth grounds of the motion for a new trial it is contended that the court erred in declaring certain veniremen competent to serve as jurors, thereby causing appellant to challenge them peremptorily. It appears that his peremptory challenges were exhausted before the jury was finally completed; one juror, J. W. Potts, having been taken after his challenges were exhausted.

N. J. Blackwell on his *voir dire* testified: "I have heard the case discussed, but not by the witnesses. What I heard was just rumor. I have an opinion, based on what I have heard, but if selected as a juror I could give the defendant a fair and impartial trial. I live down close to where the tragedy occurred, and I knew the deceased. What I heard I accepted to be the facts, and I have an opinion based on what I have heard as to guilt or innocence of the defendant, and I would take that opinion with me into the jury box, and it would take evidence to remove it. The parties who talked to me about the case were not witnesses, and only told me what they had heard. I understand it was just rumor, and I would disregard this opinion if taken as a juror. I would have to hear the witnesses testify before I would know what the facts are."

C. E. Butler testified: "I have heard some neighborhood talk about the case and have an opinion, based on what I have heard. I could disregard this opinion, however, and give both the State and the defendant a fair and impartial trial. I have talked with no witnesses. I would go into the jury box with the opinion which I have, and it would require evidence to remove it."

Farris Craig testified: "I have heard the case spoken of, but not by the witnesses. I have an opinion as to the defendant's guilt or innocence. From what I have heard I have an opinion which it would require evidence to remove. I do not know whom I talked to, he was a stranger to me. I do not know whether he was a witness or not. I do not know whether he was giving me the facts or not. He purported to tell me how the killing occurred. He did not give me the details. All the opinion that I formed was that the deceased had been killed

by the defendant. As to whether he was justified or not, I have no opinion. From what he stated, I understood he was repeating what somebody had told him. If I was selected as a juror, I could lay aside any opinion I have formed and give both parties a fair trial. From what that man said I could not have formed an opinion as to his guilt or innocence."

The court declared each of these jurors competent, over the defendant's objections and challenge for cause, and he thereupon challenged them peremptorily.

The next three jurors offered were peremptorily challenged by the defendant without a challenge for cause, and the last one, selected after his peremptory challenges were exhausted, was asked no questions by the defense.

We do not think these jurors were disqualified. It is true each of them testified that he had heard the case talked of, and some of them that they had seen accounts of the killing in the newspapers, but none of them had talked with any of the witnesses in the case, and their opinions were formed from rumor and neighborhood talk, and each of them stated he could and would give the accused a fair and impartial trial, if selected as a juror.

The court did not err in declaring them qualified and refusing to allow them challenged for cause. *Hardin* v. *State*, 66 Ark. 3; *Taylor* v. *State*, 72 Ark. 613; *Sullins* v. *State*, 79 Ark. 527.

The seventh ground of the motion assigns as error the action of the trial court in permitting the introduction of the testimony of the child, Cameline Thomasson.

But no objection was made to the competency of said witness or the admissibility of her testimony at the time, and on that account the question can not be reviewed here; and if error was committed in the introduction of the testimony of the child's mother, in effect corroborating her testimony in saying she had always related the facts after the killing about as she related them upon the witness stand, there was no objection to its introduction, and it is not subject to review by this court; even under the act of May 31, 1909. *Harding* v. *State*, 94 Ark. 65.

After a careful review of the record in this case, we are

unable to find any prejudicial error committed in the trial, and the judgment is affirmed.